Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued November 20, 2003          Decided June 15, 2004

No. 03-5019

UNITED STATES OF AMERICA,
APPELLEE

v.

JUDICIAL WATCH, INC.,
APPELLANT

————

Appeal from the United States District Court
for the District of Columbia
(No. 02ms00144)

————

*David Barmak* argued the cause and filed the briefs for appellant.

*Stuart D. Gibson*, Attorney, U.S. Department of Justice, argued the cause for appellee. On the brief were *Roscoe C. Howard, Jr.*, U.S. Attorney, and *Frank P. Cihlar* and *Gretchen M. Wolfinger*, Attorneys, U.S. Department of Justice.

————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Before:  GINSBURG, *Chief Judge*, and EDWARDS and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* GINSBURG.

GINSBURG, *Chief Judge*: The district court enforced a summons issued by the Internal Revenue Service that requires Judicial Watch to produce certain documents for an audit. Judicial Watch appeals, arguing the district court should have either quashed the summons or afforded Judicial Watch discovery and an evidentiary hearing on its claim the audit was politically motivated. Judicial Watch also argues the summons violates the First, Fourth, and Fifth Amendments to the Constitution of the United States. For the reasons set forth below, we affirm the order of the district court.

## I.  Background

Judicial Watch, a self-described "non-partisan, public interest law firm that uses the courts to fight corruption in the government and legal profession," was founded by attorney Larry Klayman in 1994. It is exempt from the income tax as an educational organization pursuant to § 501(c)(3) of the Internal Revenue Code, which applies to (among others):

> Corporations, and any . . . foundation, organized and operated exclusively for . . . educational purposes, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation . . . and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of (or in opposition to) any candidate for public office.

26 U.S.C. § 501(c)(3).

In 1997 the attention of the IRS was drawn to Judicial Watch by a letter from a recipient of a Judicial Watch fundraising solicitation who questioned whether the organization is entitled to its tax exemption. In December 1997 a committee of three IRS bureau chiefs reviewed information and

documents regarding Judicial Watch's tax-exempt status and approved an audit of its 1996 tax return. The IRS did not notify Judicial Watch that it had been selected for an audit until October 1998.

Judicial Watch's principals immediately objected, both in writing and in meetings with IRS officials, that the audit was an attempt by the Clinton Administration and IRS Commissioner Charles Rossotti to retaliate against the organization for having sued the IRS on behalf of the Western Journalism Center in mid–1998. Judicial Watch also claimed the Clinton Administration and congressional Democrats had pressured the IRS to audit Judicial Watch in retaliation for its having alleged, in a report it sent to the Congress in September 1998, that President Clinton had committed a host of impeachable offenses.

The IRS brought Judicial Watch's claims to the attention of the Treasury Inspector General for Tax Administration (TIGTA), an independent investigative office within the Department of the Treasury. The TIGTA twice investigated whether the IRS pursued the audit for political reasons. The first report (September 1999) found the IRS "recommended . . . select[ing Judicial Watch] for audit" in December 1997, that is, before it had sued the IRS or filed its impeachment report, and concluded "[n]o information was developed" to support Judicial Watch's claims. The second report (October 2000) found "no evidence" to support Judicial Watch's "allegation of political intervention" during the audit process. A report by the Staff of the Joint Congressional Committee on Taxation covering the same period likewise found "no credible evidence" that the IRS selected taxpayers for audits "based on the views espoused by [an] organization[ ] or individuals related to the organization." Joint Committee on Taxation, *Report of Investigation of Allegations Relating to Internal Revenue Service Handling of Tax-exempt Organization Matters* (JCS–3–00), at 6–11, 17–18 (March 2000).

In April 2000 the IRS notified Judicial Watch it was proceeding with the audit, and over the next two years expanded the audit to cover tax years 1996–2000 and to

require additional documents. According to the IRS, the audit now addresses whether Judicial Watch: (1) provides a private benefit either to Larry Klayman or to his law firm, Larry Klayman and Associates; (2) is entitled to tax-exempt status either as a private foundation or as a public interest law firm; and (3) earns unrelated business income for which it must pay taxes.

Late in 2000 the IRS agreed to delay the audit until President Clinton left office, in exchange for which Judicial Watch waived any potential statute of limitations defense. In January 2001 the IRS informed Judicial Watch "the audit is now continuing" and asked Judicial Watch to produce certain documents. Judicial Watch again protested, however, and the IRS again delayed the audit. In August 2001 the IRS notified Judicial Watch it was examining the corporation's tax returns and again requested documents.

In September Judicial Watch sued the IRS in the United States District Court for the District of Maryland, seeking damages for constitutional violations allegedly committed by the IRS in pursuing the audit and an injunction barring the IRS from conducting the audit. *See Judicial Watch, Inc. v. Rossotti*, 217 F. Supp. 2d 618 (D. Md. 2002), *aff'd*, 317 F.3d 401 (4th Cir. 2003). The IRS then served Judicial Watch with a summons pursuant to 26 U.S.C. § 7602(a)(2), which authorizes the Service "to summon the person liable for tax . . . to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry." Judicial Watch moved to enjoin or to stay enforcement of the summons, but the district court denied the motion and dismissed the case. *See Rossotti*, 217 F. Supp. 2d at 623–27 (injunctive relief barred by the Anti–Injunction Act, damages barred by defendants' qualified immunity).

In March 2002 the IRS repaired to the United States District Court for the District of Columbia to enforce its summons. The district court ordered the IRS to provide for the court's review *in camera* "all documents relating to its motivation and purpose" for the audit. After a hearing at

which it heard arguments regarding the purpose and the scope of the audit, and the necessity, if any, of further discovery, the district court ordered the IRS to produce additional documents and certain affidavits for *in camera* review.

In December 2002 the district court enforced the summons with a modification; the original request for all of Judicial Watch's internal and external correspondence was narrowed to reach only correspondence that is not privileged, is relevant to the audit, and is described with reasonable particularity.* *See United States v. Judicial Watch, Inc.*, 266 F. Supp. 2d 1, 23 (D.D.C. 2002). The district court concluded "there is no evidence of political vindictiveness or a retaliatory motive, respondent's constitutional challenges are without merit, and the summons [as modified] is not so overbroad as to be unlawful." *Id.* at 5.

## II. Analysis

Judicial Watch presents four arguments on appeal: (1) The audit lacks a legitimate tax-related purpose. (2) Judicial Watch is entitled to discovery and to an evidentiary hearing regarding the alleged retaliatory purpose of the audit. (3) The summons is overbroad. (4) The summons violates the first, fourth, and fifth amendment rights of Judicial Watch or of its supporters.

---

* As modified ¶ 15 of the summons requests "all minutes of meetings of the Judicial Watch Board of Directors and any other internal committees," ¶ 15(a), as well as "all internal written correspondence for the calendar years 1994 [to] 2000" pertaining to: "(1) the financial and business relationship between Judicial Watch and all related entities and individuals . . . ; (2) the process by which Judicial Watch selects cases for litigation; (3) fund raising activities; (4) compensation of attorneys who do work for Judicial Watch; (5) advocacy on legislative matters; and (6) the exempt function [that is, educational] activities carried on by Judicial Watch." ¶ 15(b). The IRS also modified ¶ 23 of the summons to request "all outgoing and incoming correspondence for the calendar years 1994 [to] 2000" pertaining to the same subjects identified in ¶ 15(b), with the exception of fund raising activities.

A.   Tax-related Purpose

Judicial Watch argues the district court should not have enforced the summons because the audit lacks any legitimate tax-related purpose. According to the taxpayer, the district court "ignore[d] the wealth of competent evidence presented by Judicial Watch of an improper, political and retaliatory motive for the audit and summons."

We review the district court's "determination of whether the factual conditions for enforcement of a summons have been met for clear error." *United States v. Ins. Consultants of Knox, Inc.*, 187 F.3d 755, 759 (7th Cir. 1999); *see Mazurek v. United States,* 271 F.3d 226, 229 (5th Cir. 2001); *Spell v. United States*, 907 F.2d 36, 39 (4th Cir. 1990). For the court to enforce the summons the Government must have established a prima facie case by showing: (1) "the investigation will be conducted pursuant to a legitimate purpose"; (2) "the inquiry may be relevant to the purpose"; (3) "the information sought is not already within the [IRS's] possession"; and (4) in issuing the summons "the administrative steps required by the [tax] Code have been followed" by the IRS. *United States v. Powell*, 379 U.S. 48, 57–58 (1964). This initial burden, however, "is a slight one, for the statute must be read broadly in order to ensure that the enforcement powers of the IRS are not unduly restricted." *United States v. Kis*, 658 F.2d 526, 536 (7th Cir. 1981); *see Alphin v. United States*, 809 F.2d 236, 238 (4th Cir. 1987) (burden "is fairly slight because this is a summary proceeding").

The district court properly concluded that declarations in which the IRS agents and officials responsible for the audit attest to each of the four elements of the prima facie case discharged the slight burden placed upon the IRS. *See Kis*, 658 F.2d at 536 ("No more than [such affidavits are] necessary to make the prima facie case"). It then fell to Judicial Watch to "disprove the actual existence of a valid civil tax determination or collection purpose" by showing the enforcement of the summons would be an abuse of the court's process. *United States v. LaSalle Nat'l Bank*, 437 U.S. 298, 316 (1978). The court's process would be abused "if the

summons [was] issued for an improper purpose, such as to harass the taxpayer." *Powell*, 379 U.S. at 58.

Judicial Watch argues the timing of the audit, coming shortly after Judicial Watch had sued the IRS and immediately after Judicial Watch had issued its report on impeachment, demonstrates the retaliatory motive behind the audit. This *post hoc, ergo propter hoc* argument would be fallacious even if it were consistent with that. The IRS decided to audit Judicial Watch in December 1997, six months before Judicial Watch filed suit against the IRS and nine months before it accused President Clinton of impeachable offenses.

Judicial Watch also argues the political motivation for the audit is shown by two statements an IRS agent made to the taxpayer's counsel early in 2000, both of which Judicial Watch characterizes as "warnings" that the organization was still on the Service's "radar screen." Judicial Watch portrays these statements as menacing solely because each "followed shortly after important developments in Judicial Watch corruption litigation against the Clinton Administration." The timing point does not deserve a further response. There is nothing nefarious, moreover, about a notice to counsel that a matter is still pending; such notice is ordinarily a courtesy to the taxpayer and is in no event suggestive of an abuse of government power.

Judicial Watch next argues the comments of several IRS agents evidence an improper retaliatory motive. According to the taxpayer, one agent said the audit was a "hot potato," and another rhetorically asked, "What do you expect when you sue the President?" Such expressions of opinion by front line revenue agents are of no moment. If there was an improper motive for initiating the audit, then that motive has to have been harbored by a person or persons with authority to initiate it. Two independent investigations by the TIGTA turned up no evidence that the Clinton Administration or any political appointee at the IRS used the audit process to retaliate against Judicial Watch. More important, Judicial Watch proffers no evidence they did.

Judicial Watch does proffer two pages of notes written by James Carville, a political advisor to President Clinton, and letters and e-mails from members of the public that were forwarded to the IRS by the White House and by Democrats in the Congress. None of these communications, however, suggests the "[i]mproper political pressure" Judicial Watch claims. The Carville notes do not so much as mention the IRS, an audit, or Judicial Watch; although they do suggest Democrats should make known "how right-wing foundations . . . provide funding for much of the Republican attack 'machine,'" they primarily suggest establishing a "clearinghouse for information which exposes the motives and methods behind Republican partisan attacks." The letters and e-mails forwarded by the White House and by Members of Congress "simply evidence constituent service, which our political system accepts and even applauds." *Rossotti*, 317 F.3d at 406 n.2. Those forwarding the inquiries asked only that "appropriate action" be taken; they made no demand upon the IRS either to audit Judicial Watch or to rescind its tax exemption.

Finally, Judicial Watch argues that even if the initiation of the audit was legitimate, the later decisions of the IRS to reinstate and to expand the audit were made solely "to punish Judicial Watch for its advocacy and anti-corruption activities." There simply are no facts, however, to support this assertion. We agree with the district court, therefore: Judicial Watch failed to show enforcing the summons would be an abuse of the court's process.

B.  Discovery and an Evidentiary Hearing

Judicial Watch next claims it is entitled to discovery and to an evidentiary hearing regarding the IRS's motive for the audit because it has "develop[ed] facts from which a court might infer a possibility of some wrongful conduct by the Government." *Kis*, 658 F.2d at 540. In response the IRS, quoting *SEC v. McGoff*, 647 F.2d 185, 194 (D.C. Cir. 1981), characterizes Judicial Watch's allegations as no more than "diffuse speculations [that] do not establish the exceptional circumstances necessary to take this case out of the general rule" against discovery when resisting enforcement of an

administrative summons. We review the district court's decision to deny Judicial Watch discovery and an evidentiary hearing only for an abuse of discretion. *See United States v. Gertner*, 65 F.3d 963, 969 (1st Cir. 1995) (decision "to withhold an evidentiary hearing in a summons enforcement proceeding" reversible "only if the appellant demonstrates an abuse of the trial court's substantial discretion"); *Brune v. IRS*, 861 F.2d 1284, 1288 (D.C. Cir. 1988) (district court's "decision to allow or deny discovery is reviewable only for abuse of discretion").

In this circuit discovery regarding the motivation for an audit is permitted only when the movant has shown "extraordinary circumstances," *McGoff*, 647 F.2d at 193, that take him out of "the class of the ordinary taxpayer, whose efforts at seeking discovery would, if allowed universally, obviously be too burdensome" to the IRS. *United States v. Fensterwald*, 553 F.2d 231, 231–32 (D.C. Cir. 1977); *see United States v. Exxon Corp.*, 628 F.2d 70, 77 n.7 (D.C. Cir. 1980). Judicial Watch has not established such "extraordinary circumstances." Indeed, as we saw in Part II. A. above, it has not established anything out of the ordinary about the motivation of the IRS.

Judicial Watch urges us to follow the Seventh Circuit in requiring that it establish only the "possibility" of an improper motive before it may obtain further discovery. But that would not avail it. What Judicial Watch calls the "possibility standard," the Seventh Circuit has explained, "is significantly more stringent than [the standard that must be met by] a party opposing a motion for summary judgment," *Kis*, 658 F.2d at 543; that is, Judicial Watch would have to have evidence sufficient to raise a genuine issue of fact material to whether the audit is an act of political retaliation. Again as we have seen, Judicial Watch has proffered no evidence of that sort.

In any event, the district court did not merely, as Judicial Watch states in bold type and italics, "***refus[e] it all discovery and an evidentiary hearing***." Rather, the district court itself required the IRS to produce affidavits, *see Fensterwald*, 553 F.2d at 232–33 (holding "the District Judge should allow

some measure of discovery, preferably by specific interrogatories . . . or perhaps by an overall affidavit made by a . . . responsible and knowledgeable official as to all relevant details of how taxpayer . . . was selected for this audit"); the court also required the IRS to produce "all documents relating to its motivation and purpose" for the audit — which came to more than 1,000 pages — and it held a hearing at which it heard arguments regarding the materials produced. Although Judicial Watch was not allowed to propound its own requests for further discovery, the decision whether to permit party-directed discovery is within the sound discretion of the district court. *See id.* at 233 (requiring only "discovery procedures deemed appropriate by the district court"). Nor is Judicial Watch entitled to an evidentiary hearing at which to cross-examine the various IRS agents and officials who submitted sworn declarations at the request of the court. "If the taxpayer cannot develop even the evidence necessary to [suggest an audit was improper], then an evidentiary hearing would be a waste of judicial time and resources." *Kis*, 658 F.2d at 540. In sum, the district court did not abuse its discretion in denying Judicial Watch further discovery and another hearing.

C. Scope of the Summons

Judicial Watch also argues the summons, even as modified, is excessive and overbroad because of the number of years covered and the number of documents sought. Drawing upon the declaration of former IRS Commissioner Donald Alexander, Judicial Watch claims "the scope of the documents and information requested is unheard of and cannot be explained by any legitimate tax enforcement objective." The IRS argues in response that the modified summons is not overbroad because it "clearly advised Judicial Watch what was required of it" and sought documents that "clearly shed light on the various issues under investigation" in the audit. We review for abuse of discretion the district court's determination the summons was not overbroad. *See Rogers Transp., Inc. v. Stern*, 763 F.2d 165, 167 n.2 (3d Cir. 1985); *United States v. Malnik*, 489 F.2d 682, 686 n.4 (5th Cir. 1974); *United States v. Ruggiero*, 425 F.2d 1069, 1071 (9th Cir. 1970) (per curiam).

Although the IRS seeks records spanning a number of years and regarding a number of subjects, *see* p. 5 n.* above, the summons is not overbroad. Section 7602 grants "broad and expansive" authority to the IRS to summon documents from taxpayers, *United States v. Bichara*, 826 F.2d 1037, 1039 (11th Cir. 1987), provided the documents "may be relevant or material" to the inquiry of the IRS, *United States v. Arthur Young & Co.*, 465 U.S. 805, 814 (1985) (use of " 'may be' reflects Congress's express intention to allow the IRS to obtain items of even *potential* relevance to an ongoing investigation") (emphasis in original). The relevance threshold is "a low one," and the Government need show only "that inspection of the desired records 'might throw light' upon the correctness of the taxpayer's return and liabilities." *Kis*, 658 F.2d at 537 (quoting *United States v. Turner*, 480 F.2d 272, 279 (7th Cir. 1973)). Here, each type of document sought "throw[s] light" upon whether Judicial Watch is entitled to its tax-exemption. In particular, the documents are relevant to whether Judicial Watch: is entitled to tax-exempt status either as a private foundation or as a public interest law firm; provides a private benefit either to Larry Klayman or to his law firm; or earns unrelated business income upon which it must pay taxes — either from its relationship with Larry Klayman and Associates or from its sale of merchandise over the internet.

That the records sought are "extensive is not material" so long as the records are relevant to the matters at issue in the audit. *United States v. Luther*, 481 F.2d 429, 433 (9th Cir. 1973); *see Spell*, 907 F.2d at 39 (rejecting taxpayer's claim summons posed "burden of significant proportions" where summoned records were relevant to "legitimate purpose of determining the correctness of his tax returns"). Therefore, the district court did not abuse its discretion in holding the summons was not overbroad.

D.   Constitutional Challenges

Finally, Judicial Watch argues the audit, the summons, or both violate the First, Fourth, and Fifth Amendments. None of these constitutional claims is meritorious.

### 1. First Amendment

Judicial Watch argues the audit and the summons violate the First Amendment for two reasons, the first of which is that the IRS initiated the audit in retaliation for Judicial Watch's exercise of its first amendment rights of speech and of association. As we have seen, however, Judicial Watch has failed to establish the factual predicate for this argument.

The second argument is that enforcement of the IRS's request for the names of all donors who contributed more than $3,000 to Judicial Watch will chill the exercise of its supporters' and potential donors' first amendment rights because they will reasonably fear the IRS will audit them individually, for which proposition it cites *United States v. Church of World Peace*, 775 F.2d 265, 266–67 (10th Cir. 1985) (denying IRS request for names of persons married by church on ground of chill to first amendment right of religious freedom). Judicial Watch, however, proffers no evidence remotely like the unchallenged affidavits the taxpayer submitted in *Church of World Peace*. In that case, it was undisputed that each "member known to the IRS has had his or her income tax return audited, and that the additional names are requested [by the IRS] for that purpose." *Id.* at 266. Although Mr. Klayman claims "[s]upporters who are potential donors frequently ask . . . whether they will be audited if they make a donation," a general fear of the IRS is insufficient to establish that speech will be chilled. *See United States v. Northcutt*, 680 F.2d 54, 56 (8th Cir. 1982) ("generalized dread, undoubtedly shared by many taxpayers, of investigation by the IRS" held insufficient to establish first amendment violation). Nor is it significant, without more, that "several" Judicial Watch "clients, donors, and others sympathetic to its mission" have been audited. For all the evidence in the record, that could be fewer audits than one would expect among the same number of taxpayers chosen at random. Therefore, unlike the taxpayer in *Church of World Peace*, Judicial Watch has not produced sufficient evidence to support its allegation that enforcement of the summons will chill its members' speech.

### 2.   Fourth Amendment

Judicial Watch's fourth amendment claim is based upon its argument the summons is excessive and overbroad. A summons is not overbroad for the purpose of the Fourth Amendment ban on "unreasonable searches and seizures" if the inquiry is "within the authority of the agency, the demand is not too indefinite[,] and the information sought is reasonably relevant." *United States v. Morton Salt Co.*, 338 U.S. 632, 652–53 (1950); *see Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 209 (1946). As stated in Part II. C., the summons seeks documents "reasonably relevant" to the audit and is neither overbroad nor excessive to the investigation of Judicial Watch's tax-exempt status. Furthermore, there is no dispute the summons, as modified, described the requested documents "with sufficient particularity" to enable Judicial Watch to comply. *United States v. Linsteadt*, 724 F.2d 480, 483 (5th Cir. 1984). Therefore, Judicial Watch's fourth amendment claim must fail.

### 3.   Fifth Amendment

Finally, Judicial Watch contends the IRS is violating its fifth amendment rights to equal protection and due process by "selectively prosecuting" it "on constitutionally impermissible grounds," namely, "retaliation for protected speech." These claims, too, depend upon the IRS having a retaliatory motive for the audit, which Judicial Watch has failed to establish.

## III.   Conclusion

For the foregoing reasons, the order of the district court is

*Affirmed.*